N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALONZO L. HAYNES | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CAROLYN W. COLVIN | : | NO. 14-1878 |

**REPORT AND RECOMMENDATION**

ELIZABETH T. HEY, U.S.M.J.                                      June 15, 2016

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application filed by Alonzo L. Haynes ("Plaintiff") for disability insurance

benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the

Social Security Act ("Act").  For the reasons that follow, I conclude that the decision of

the Administrative Law Judge ("ALJ") is not supported by substantial evidence.

Therefore, I recommend that this matter be remanded for further proceedings pursuant to

sentence four of 42 U.S.C. § 405(g).

**I.      PROCEDURAL HISTORY**

Plaintiff protectively applied for DIB and SSI on December 17, 2008, alleging an

onset date of January 31, 2007.  Tr. at 185-91, 192-95, 207.[1]  The applications were

denied initially and Plaintiff requested an administrative hearing.  Id. at 104-07, 108-12,

115-20.  ALJ William Reddy conducted a hearing on April 9, 2010, and on May 25,

_____

[1]Plaintiff's date last insured for purposes of DIB is June 30, 2011.  Tr. at 205, 207.

2010, issued an unfavorable decision, finding that Plaintiff retained the residual functional capacity ("RFC") for a full range of light work.  Id. at 66-101, 53-62.  On August 15, 2011, the Appeals Council granted Plaintiff's request for review and remanded for a new hearing.  Id. at 48-52.

On March 22, 2012, a second administrative hearing was held before ALJ Nancy Lisewski.  Tr. at 26-47.  On April 6, 2012, ALJ Lisewski issued an unfavorable decision, finding that Plaintiff retained the RFC for a limited range of medium work.  Id. at 13-21.  On January 27, 2014, the Appeals Council denied Plaintiff's request for review.  Id. at 1-5.  Therefore, ALJ Lisewski's April 6, 2012, decision is the final decision of the Commissioner.  20 C.F.R. §§ 404.972, 416.1472.

Plaintiff commenced this action on March 31, 2014, and submitted a Brief and Statement of Issues in Support of Request for Review on January 5, 2015.  Docs. 1 & 15.  Defendant filed a response and Plaintiff filed a reply, after which the Honorable Jeffrey L. Schmehl referred the matter to the undersigned for a Report and Recommendation.  Docs. 16-18.

## II.   <u>LEGAL STANDARD</u>

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusions that Plaintiff is not disabled and is capable of performing jobs that exist in significant

numbers in the national economy.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  <u>Zirnsak v. Colvin</u>, 777 F.2d 607, 610 (3d Cir. 2014) (quoting <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

1.    Whether the claimant is currently engaged in substantially gainful activity;

2.    If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3.    If so, whether, based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.    If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and

5.    If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the

Commissioner at the fifth step to establish that the claimant is capable of performing

other jobs in the local and national economies, in light of his age, education, work

experience, and residual functional capacity.  See Poulos v. Comm'r of Soc. Sec., 474

F.3d 88, 92 (3d Cir. 2007).

## III.   FACT RECORD AND THE ALJ'S DECISION

Plaintiff was born on May 26, 1959, and thus was 52 years of age on his date last

insured (June 30, 2011) and at the time of ALJ Lisewski's decision (April 6, 2012).  Tr.

at 185, 192, 207.  Plaintiff completed the twelfth grade in special education classes,

although he is reportedly illiterate.  Id. at 29, 30-31.  He did not attend trade or vocational

school and has no special job training.  Id. at 31, 259.  He is five feet, ten inches tall, and

weighs between approximately 199 and 220 pounds.  Id. at 271, 297, 301, 355, 398.

Plaintiff lives in a house with his girlfriend and does not take care of anyone other than

himself.  Id. at 39, 73, 243, 244.  He has past relevant work as dishwasher, food prep

worker, laborer, and landscaper, and he last worked in 2007.  Id. at 40-41, 211, 224, 233.

He alleged disability due to diabetes and problems with his heart, lung and back.  Id. at

223.

A       <u>**Medical Evidence and Other Testing**</u>

The ALJ found that Plaintiff suffered from severe impairments of diabetes mellitus, diabetic neuropathy, chronic obstructive pulmonary disease ("COPD"), coronary artery disease, hypertension, and hypothyroidism.  <u>Id.</u> at 16.[2]  These diagnoses are consistent with those found in the medical record.  Plaintiff also relies in his brief on evidence of an intellectual disability.  Doc. 15 at 8-9.

The earliest records contained in Plaintiff's file are school records, including multiple intelligence quotient ("IQ") test results evidencing diminished intellectual ability.  <u>Tr.</u> at 263-65.[3]  Specifically, an IQ test administered to Plaintiff in 1965 in first grade yielded a score of 68; a Wechsler Intelligence Scale for Children ("WISC") test administered in 1969 in fourth grade yielded a verbal IQ score of 70, a performance IQ

---

[2]Diabetic neuropathy is a type of nerve damage caused by diabetes, most often in legs and feet.  <u>See</u> http://www.mayoclinic.org/dieases-conditions/diabetic-neuropathy/basics/definition (last visited May 31, 2016).  COPD is any disorder characterized by persistent or recurring obstruction of bronchial air flow, such as chronic bronchitis, asthma, or pulmonary emphysema.  <u>DIMD</u> at 530.  Coronary artery disease develops when major blood vessels that supply the heart with blood, oxygen and nutrients become damaged or diseased, usually attributable to cholesterol-containing deposits (plaque) in the arteries, and inflammation.  <u>See</u> http://www.mayoclinic.org/dieases-conditions/coronary-artery-disease (last visited May 31, 2016).  Hypertension is high arterial blood pressure.  <u>DIMD</u> at 896.  Hypothyroidism is defined as "deficiency of thyroid activity, characterized by decrease in basal metabolic rate, fatigue, and lethargy."  <u>Id.</u> at 907.

[3]IQ tests are designed to assess human intelligence and to diagnose mental retardation, which is characterized by significantly subaverage intellectual functioning (often expressed as an IQ of less than 70 to 75), combined with limitations in more than two areas of functioning.  <u>The Merck Manual</u>, 18th ed. (2006), at 2491.

score of 86, and full scale IQ score of 75; and a Binet test administered in 1972 yielded

an IQ score of 66.  Id. at 264.[4]  High school records reveal that Plaintiff received mostly

"C's" and "D's" in his classes, including a final grade of "C" in reading in his senior

year.  Id. at 265.[5]

The record contains treatment notes from Alexander Bunt Jr., D.O., Plaintiff's

primary care physician from January 2006 through February 2012.  Tr. at 268-78, 398-

412, 437.  Dr. Bunt routinely diagnosed Plaintiff with various chronic conditions, such as

insulin dependent diabetes mellitus (sometimes referred to as "uncontrolled") and

hypothyroidism, and also treated him for various acute conditions.  Id. at 403, 406-08,

411.[6]  For example, on February 23, 2010, the doctor diagnosed Plaintiff with acute

---

[4]The WISC is a group of tests for assessment of intellectual functioning in children ages 5 to 15, the combination of which yields a full scale IQ score.  DIMD at 1672.  A Binet test (or Stanford-Binet test) is a standardized test that measures intelligence and cognitive abilities in children and adults.  See http://minddisorders.com/Py-Z/Stanford-Binet-Intelligence-Scale.html (last visited June 3, 2016).

[5]The grade report is very difficult to read, but appears to show final grades in reading of "B" (eight grade), "D" (ninth grade) and "C" (twelfth grade), and final grades in English of "D" (seventh and ninth grades), "B" (eighth grade), and "C" (tenth through twelfth grades).  Tr. at 265.

[6]Although the record contains a diagnosis of Type II diabetes mellitus, see tr. at 364, ALJ Lisewski's statement that Plaintiff has "insulin dependent diabetes mellitus," id. at 60, is supported by the record.  See, e.g., id. at 371, 404, 406.  Both types of diabetes are chronic conditions, but whereas Type I always requires lifelong daily insulin treatment, Type II generally requires lifestyle changes such as increased exercise and dietary restrictions, and sometimes insulin and/or other medications.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 9:00(B)(5); Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 506.

costochondritis; on September 27, 2010, the doctor diagnosed cellulitis, abdominal pain

related to an umbilical hernia, and ankle and foot pain; and June 30, 2011, the doctor

diagnosed "arm dermatitis" attributed to weed-whacking.  Id. at 437, 410, 403.[7]

The record also contains treatment notes from Eric S. Heffelfinger, D.O., a

physician at Suburban Pulmonary Medicine, P.C., dated March 2009 through May 2011.

Tr. at 371-97.  These records document repeated complaints of shortness of breath and

other chest pain; repeated diagnoses of diabetes, hypothyroidism, and COPD; and

repeated notations regarding Plaintiff's long history of smoking, for which he received

office counseling on smoking cessation, the need to lose weight, and the need to comply

with medication.  Id. at 371-88.  During this time, Plaintiff's medications included insulin

pen needle, Lipitor, Spiriva inhaler, naproxen, Synthroid, Hydroxyzine, Gabapentin,

Propoxyphene, and Symbicort.  Id. at 371, 374, 377, 380, 383, 386.[8]

---

[7]Costochondritis is defined as inflammation of the cartilaginous junction between a rib or ribs and the sternum.  DIMD at 423.  Cellulitis is an inflammation of the deep subcutaneous tissues and sometimes muscle.  Id. at 325.  Dermatitis is inflammation of the skin.  Id. at 494.

[8]Lipitor (atorvastatin) is used to treat high cholesterol and to lower the risk of stroke, heart attack, or other heart complications in people with Type 2 diabetes, coronary heart disease, or other risk factors.  See http://www.drugs.com/lipitor.html (last visited May 31, 2016).  Spiriva (tiotropium) inhaler is used to prevent bronchospasm (narrowing of the airways in the lungs) in people with COPD, including bronchitis and emphysema.  See http://www.drugs.com/spiriva.html (last visited May 31, 2016).  Naproxen is a used to treat pain or inflammation caused by conditions such as arthritis, spondylosis, tendinitis, and bursitis.  See http://www.drugs.com/naproxen.html (last visited May 31, 2016).  Synthroid treats hypothyroidism and is also used to treat or prevent goiter (enlarged thyroid gland).  See http://www.drugs.com/synthroid.html (last visited May 31, 2016).  Hydroxyzine is used as a sedative to treat anxiety and tension.  See

On September 21, 2011, Edward R. Stankiewicz, M.D., conducted a consultative examination of Plaintiff.  Tr. at 355-57.  Dr. Stankiewicz noted Plaintiff's history of bowel reconstruction surgery and a spleen removed after he was stabbed in an assault in 1997, and that he has smoked cigarettes for 35 years.  Id. at 355.  Plaintiff reported localized left-sided rib pain, which he attributed to the stabbing assault.  Id.  Dr. Stankeiweicz performed a physical exam and a limited neurological exam, both of which were within normal limits.  Id. at 356.  The doctor diagnosed Plaintiff with, among other things, diabetes mellitus, diabetic polyneuropathy, lumbar spondylosis, coronary artery disease, hypothyroidism and COPD.  Id.[9]   Plaintiff's medications included insulin, Lipitor, Spiriva inhaler, naproxen, Lasix, and Synthroid.  Id. at 356-57.[10]

Also on September 21, 2011, Dr. Stankiewicz also completed a Medical Source Statement of Plaintiff's ability to perform work-related physical activities.  Id. at 358-59.

---

http://www.drugs.com/hydroxyzine.html (last visited May 31, 2016). Gabapentin is an anti-epileptic medication used to treat nerve pain.  See http://www.drugs.com/gabapentin.html (last visited May 31, 2016).  Propoxyphene is a narcotic pain reliever used to treat mild to moderate pain.  See http://www.drugs.com/propoxyphene.html (last visited May 31, 2016).  Symbicort (brudesonide and formoterol inhaler) is used to prevent bronchospasm in people with asthma or COPD.  See http://www.drugs.com/propoxyphene.html (last visited May 31, 2016).

[9]Spondylosis is defined as degenerative spinal changes due to osteoarthritis. DIMD at 1754.

[10]Lasix treats fluid retention (edema) in people with congestive heart failure, liver disease, or kidney disorders, and is used to treat high blood pressure.  See http://www.drugs.com/lasix.html (last visited May 31, 2016).

The doctor opined that Plaintiff could lift and carry up to 25 pounds frequently and up to 50 pounds occasionally; had no limitation in standing and walking or in sitting; could occasionally bend, kneel, stoop, crouch, balance and climb; and should avoid poor ventilation, temperature extremes, chemicals, and fumes, odors and gases. Id. Dr. Stankiewicz further opined that Plaintiff had no limitation in his ability to perform other physical functions, including reaching, handling, and fingering. Id. at 359.

On January 19, 2012, Dr. Bunt reported that Plaintiff complained of bilateral wrist pain and diagnosed carpal tunnel syndrome ("CTS"). Tr. at 399.[11] On February 19, 2012, Dr. Bunt's associate Michelle Lewis, FNP-BC, noted Plaintiff's symptoms of wrist weakness associated with CTS, and opined that Plaintiff could only occasionally use his hands for manipulation and needed surgery on his bilateral wrists. Id. at 364-65.[12]

On February 17, 2012, Dr. Heffelfinger completed a medical source statement regarding Plaintiff's COPD. Tr. at 368-70. Based on Plaintiff's pulmonary function study and blood gas reports, Dr. Heffelfinger indicated the presence of dyspnea[13] on exertion, chronic cough, and chest pain. Id. at 368. The doctor diagnosed Plaintiff with

---

[11]Carpal tunnel syndrome is an entrapment neuropathy characterized by pain and burning or tingling in the fingers and hand caused by compression of the median nerve in the carpal tunnel of the wrist. DIMD at 1824.

[12]Curiously, the same page of the record containing a stamp identifying Ms. Lewis as a board-certified nurse practitioner also has a signature line containing her signature followed by a pre-printed "M.D." Tr. at 367. There is no dispute that Ms. Lewis is not a medical doctor. See Doc. 15 at 4-5; Doc. 17 at 2-3.

[13]Dyspnea is defined as breathlessness or shortness of breath. DIMD at 582.

Stage II COPD, characterized by worsening airflow limitation with shortness of breath typically developing on exertion.  Id.  Dr. Heffelfinger opined that Plaintiff was limited to standing at one time for 30 minutes, had no limitations in sitting, could work for four hours per day, could occasionally lift five pounds, and could not tolerate dust, smoke or fumes.  Id. at 369.[14]

On February 21, 2012, Emily Choi, M.D., conducted a nerve conduction test on Plaintiff for evaluation of numbness and tingling in both hands and burning in his feet.  Tr. at 413-14.  Dr. Choi reported evidence of diffuse sensorimotor peripheral neuropathy affecting Plaintiff's upper and lower extremities, most likely due to diabetes, and "likely moderate, right median neuropathy at the wrist . . . ."  Id. at 414.  The doctor noted that the study was limited due to Plaintiff's inability to tolerate the examination.  Id.

**C.    Hearing Testimony and Other Evidence**

At his second administrative hearing held on March 22, 2012, Plaintiff identified difficulty picking up things, tightness in his back and shortness of breath as the main things that keep him from working.  Tr. at 31, 38.[15]  He experienced difficulty breathing when lifting at his last job, which he attributed to his COPD for which he has an inhaler.

---

[14]Dr. Heffelfinger indicated "none" in response to a question regarding Plaintiff's limitations with regard to lifting on a frequent basis, but in context it is clear the doctor intended for "none" to mean that Plaintiff could not lift any weight frequently.  Tr. at 369.

[15]In the Function Report dated July 20, 2009, Plaintiff listed problems with reaching and using his hands.  Tr. at 248.  At his first administrative hearing, Plaintiff described "tingling in my fingers" on the left and "numbness and stuff start running down the left side of my arm."  Id. at 76, 77.

Id. at 32-33.[16]  He stated that he could walk maybe 75 feet before getting winded and

needing to stop or take a puff of his inhaler, which in turn required 15 minutes of idleness

before proceeding.  Id. at 33-34.  His back tightens up if he stands too long, and he has

numbness in his feet attributed to diabetes.  Id. at 35.  He needs to lie down about three

times per day due to his back pain.  Id. at 39.

 Plaintiff testified at both of his hearings that he has trouble reading and writing,

for example he has other people fill out his applications and his girlfriend reads mail to

him.  Tr. at 31, 39, 69.  He explained that although he completed the twelfth grade in

special education classes, he had trouble reading and writing throughout the entirety of

his schooling.  Id. at 30-32.  He can read only small words and write only basic things

like his name and address; he cannot read a newspaper.  Id. at 74-75, 92.[17]

 Plaintiff has a driver's license but does not drive or own a car.  Tr. at 73, 246.  He

can do chores such as sweeping, vacuuming, taking out trash, doing the dishes, cooking

for himself, and doing laundry, and he sometimes goes shopping with his girlfriend.  Id.

at 85-86, 245.  He started smoking at age 15 and smoked about a half a pack per day as of

March 2009, see id. at 84, 377, but testified at his April 2010 hearing that he had since

"cut back."  Id. at 84.

---

[16]Plaintiff testified that his COPD was exacerbated by the incident in which he was
stabbed and beaten in 1997, resulting in a punctured lung.  Tr. at 35-36.

[17]In his Function Report, in response to the question "Do you finish what you
start?" Plaintiff stated, "It depends on how long the conversation, reading + watching tv
or a movie is."  Tr. at 248.

A VE also testified at Plaintiff's March 22, 2012 administrative hearing.  Tr. at 40-47.  The VE characterized Plaintiff's past relevant work as a dishwasher as medium and unskilled; his food prep work as light and unskilled; his laborer work as medium and unskilled; and his landscaping job as heavy and unskilled.  Id. at 40-41.[18]  The ALJ asked the VE to assume a person of Plaintiff's age, education and work experience who was limited to medium work, could perform all postural activities occasionally, and had to avoid concentrated exposure to poor ventilation, temperature extremes, chemicals, fumes, odors or dust.  Id. at 41.  The VE stated that such a person could perform Plaintiff's past relevant work as a dishwasher and food preparer, as well as other jobs such as sorter, packer, and inspector and examiner.  Id. at 41-42.

If the hypothetical person were precluded from standing for more than half an hour without taking a break, the VE testified that he could not perform Plaintiff's past relevant jobs as a dishwasher or food preparer; and if the person needed to take an

---

[18]Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, the Social Security Administration has determined that he or she can do sedentary and light work.  20 C.F.R. §§ 404.1567(c), 416.967(c).  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten 10 pounds.  20 C.F.R. §§ 404.1567(b); 416.967(b).  Even though the weight lifted may be very little, a job is in the light category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  Id.  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  Id.  If someone can do light work, the Social Security Administration has determined that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  Id.

additional half-hour break every day to lie down to alleviate back pain, the VE testified that he could not perform any job.  Tr. at 42-43.  If the hypothetical person were functionally illiterate, the VE testified that there could be such an erosion in the job base that he could not perform any of the identified jobs.  Id. at 44-45.  Similarly, if the hypothetical person got winded after 75 steps, the VE explained that it could be a problem for any medium or light job "simply because of the fact that you're on your feet all day," and if the person needed to take a break almost every day for more than a half an hour or an hour at a time, such a person would be precluded from working.  Id. at 46-47.

**D.    ALJ's Opinion**

In the decision dated April 6, 2012, the ALJ found as follows:

1.    At step one, the ALJ found that Plaintiff was not engaged in substantial gainful activity since January 31, 2007, the alleged onset date.  Tr. at 15.

2.    At step two, the ALJ found that Plaintiff has the following severe impairments: diabetes mellitus, diabetic neuropathy, COPD, coronary artery disease, hypertension, and hypothyroidism (20 C.F.R. §§ 404.1520(c), 416.920(c)).  Id. at 16.

3.    At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Id. at 18.

4.    The ALJ determined that Plaintiff retains the RFC to perform medium work, except he can perform postural activities only occasionally and must avoid concentrated exposure to poor ventilation, temperature extremes, chemicals, fumes, odors and dust.  Id.

5.     At step four, the ALJ found that Plaintiff is capable of performing his past relevant work as a dishwasher and food prep clerk.  Id. at 20.

6.     In the alternative, at step five the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform.  Id. at 20-21.

Therefore, the ALJ concluded that Plaintiff was not disabled.  Id. at 21.

In his request for review, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) failed to impose any manipulative limitations, (2) failed to discuss evidence regarding Plaintiff's intellectual disability and not ordering IQ testing, and (3) erroneously assessed Plaintiff's RFC.  Doc. 15 at 4-13; Doc. 17 at 1-4.  Defendant argues in response that the ALJ's decision is supported by substantial evidence.  Doc. 16 at 3-16.

## IV.   **DISCUSSION**

### A.     **Consideration of Plaintiff's Manipulative Limitations**

Plaintiff first argues the ALJ's opinion is not supported by substantial evidence because the ALJ failed to impose any manipulative limitations.  Doc. 15 at 4-8; Doc. 17 at 1-4.  Defendant responds that this aspect of the ALJ's opinion is supported by substantial evidence.  Doc. 16 at 5-9.

As previously noted, the ALJ found that Plaintiff retained the RFC to perform medium work, except he can perform postural activities only occasionally and must avoid concentrated exposure to poor ventilation, temperature extremes, chemicals, fumes, odors and dust.  Id. at 18.  In reaching this determination, the ALJ stated the following:

14

At an examination by [Dr. Stankiewicz] on September 21,
2011, a limited neurological examination was within normal
limits.  [Plaintiff] had a normal station and gait.  Sensation,
motor strength, and reflexes were normal. . . .

. . . .

[Plaintiff] testified that he is 52 years old and took a train
from Chester, PA to get to this hearing.  He does not work
and receives support from his family and the State.  He
completed high school and was in a special education
curriculum.  He is able to read and write, but needs help with
applications so someone else completes them for him.

[Plaintiff] testified that he is unable to work because of
tightness in his back, which is treated with pain medications.
He has COPD, for which he uses an inhaler.  Exacerbations
are triggered by exertion.  He becomes winded after walking
75 feet.  At that point, he must take a puff from an inhaler or
simpl[y] stop walking.  He is able to lift about 10 pounds, but
could not do constant lifting.  This would make him short-
winded and makes his back tighten.  His back also tightens
when he stands for too long.  In his home, there are 12 steps
and he becomes short of breath by the time he gets to the top.
He would be unable to do a job that involved climbing stairs.

[Plaintiff] testified that in addition to COPD and his back
problems, he has diabetes, which causes numbness in his feet.
His feet are always burning.

. . . .

[Plaintiff] testified that he is illiterate and that his fiancée
reads the mail to him.  However, he is not illiterate.
Education records . . . show that he obtained "Bs" in reading.
This would not be possible if [Plaintiff] was actually unable
to read.  He said that his girlfriend completes forms for him.
However, the function report . . . is completed in the first
person.  Moreover, at the prior hearing, he admitted to being
able to read small words.  The inconsistency of [Plaintiff's]
statements regarding his literacy serves to undermine his

overall credibility and the persuasiveness of his statements
regarding disability.

There is evidence that [Plaintiff] has not been entirely
compliant in taking prescribed medications. . . .  This
noncompliance suggests that the symptoms may not have
been as limiting as [Plaintiff] has alleged . . . .

Objective medical findings are inconsistent with the severity
of symptoms alleged, much less with a finding of "disabled."
Recent pulmonary function studies show no greater than a
mild restriction and no evidence of airflow obstruction.  A
recent physical examination revealed [Plaintiff's] chest was
clear to percussion and auscultation with no wheezing, rales,
or rhonchi.  The cardiac examination disclosed no murmurs,
rubs or gallops.  The extremities showed no edema, clubbing
or cyanosis.  A limited neurological examination was within
normal limits.  [Plaintiff] had normal station and gait,
mentation, sensation, motor strength, and reflexes.

As for opinion evidence, I considered the medical statement
from [Ms. Lewis].  She addressed a[n RFC] for a significantly
less than full range of sedentary exertion.  However, in
addition to her opinion being inconsistent with the clinical
signs and medical findings of record, Ms. Lewis is not an
acceptable medical source and I must therefore discount her
opinion.

Dr. Heffelfinger's medical statement restricts [Plaintiff] to
such a significantly less than full range of sedentary exertion
that he would be unable to sustain any form of employment.  I
reject this opinion because of its inconsistency with
substantive evidence elsewhere in the record.  Pulmonary
testing shows [Plaintiff] has only mild COPD *and* continues
to smoke.  Additionally, Dr. Heffelfinger notes [Plaintiff's]
non-compliance with medical advice. . . .

Tr. at 17, 19-20 (exhibit citations omitted) (emphasis in original).

In concluding that Plaintiff retained the RFC to perform a range of medium work, the ALJ essentially adopted the RFC assessment made by Dr. Stankiewicz on September 21, 2011, in which the doctor opined that Plaintiff could lift and carry up to 25 pounds frequently and up to 50 pounds occasionally; had no limitation in standing and walking or in sitting; could occasionally bend, kneel, stoop, crouch, balance and climb; and should avoid poor ventilation, temperature extremes, chemicals, and fumes, odors and gases.  Id. at 18, 358-59.  However, reliance on Dr. Stankiewicz's assessment to find no manipulative limitations is inappropriate because it pre-dated three items of record evidence; (1) Dr. Bunt's January 2012 report indicating that Plaintiff had bilateral wrist pain and a diagnosis of CTS, (2) Ms. Lewis's February 2012 report indicating that Plaintiff exhibited wrist weakness and could only occasionally use his hands for manipulation, [19] and (3) Dr. Choi's February 2012 nerve conduction test on Plaintiff

---

[19]The Commissioner argues that Ms. Lewis, a board-certified nurse practitioner employed by Dr. Blunt, Plaintiff's treating physician, is not an acceptable medical source, which is defined as licensed physicians and osteopaths, and licensed or certified psychologists.  Doc. 16 at 8 & n.4 (citing 20 C.F.R. §§ 404.1513, 416.913).  This argument is a red herring.  Social Security regulations provide that the Commissioner "may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work."  20 C.F.R. §§ 404.1513(d), 416.913(d).  Indeed, depending on the facts of a particular case, "an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source,'" such as where the individual who is not an acceptable medical source "has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."  S.S.R. 06-03p, 2006 WL 2329939, at *5.  So whereas Ms. Lewis's opinion that Plaintiff required surgery on his wrists is not entitled to weight - - no physician has opined that Plaintiff requires such surgery -- her opinion regarding his manipulative restrictions must be considered,

which showed evidence of diffuse sensorimotor peripheral neuropathy affecting Plaintiff's upper and lower extremities and "likely moderate, right median neuropathy at the wrist." Id. at 399, 364, 413-14.  The ALJ's failure to consider this evidence and its potential impact on Plaintiff's ability to grasp and manipulate objects is also problematic because the ALJ found diabetic neuropathy to be a severe condition, and because Dr. Choi specifically opined that the nerve conduction study's finding of sensorimotor peripheral neuropathy was "most likely" caused by Plaintiff's diabetes. Id. at 414.  Dr. Bunt's diagnosis of CTS and Dr. Choi's diagnostic test confirming moderate, right median neuropathy at the wrist are consistent with Plaintiff's complaints of wrist weakness and Ms. Lewis's assessment that Plaintiff could only occasionally manipulate objects with his right or left hand.  The ALJ's failure to discuss any manipulative limitations is further problematic because she concluded that Plaintiff could perform his past relevant work as a dishwasher and food prep clerk (id. at 20), and other work such as sorter, packer and inspector (id. at 21), all of which obviously entail some degree of grasping and other manipulations.

The Commissioner argues that even if Plaintiff has manipulative limitations they would not significantly erode the occupational base for medium or light work, essentially rendering harmless the ALJ's failure in this regard.  Doc. 16 at 9-10.  I disagree.  As previously noted, Plaintiff's wrist weakness and CTS were newly diagnosed at the

---

particularly because her opinion in this regard is supported by Plaintiff's symptom of wrist weakness and diagnosis of CTS.  Tr. at 364.

beginning of 2012, and it is impossible to determine how rapidly or how seriously the condition worsened.  This is particularly true in Plaintiff's case given his history of diabetes and associated problems such as diabetic neuropathy, which the ALJ found to be a severe condition and which Dr. Choi identified as the likely cause of Plaintiff's neuropathy at the wrist.  Moreover, the comparatively recent appearance of Plaintiff's wrist weakness and CTS, and the limitations attributed to them, potentially renders obsolete the ALJ's reliance on earlier record evidence of Plaintiff's motor strength, ability to lift weight, and activities such as chores and weed-whacking - - all evidence used to support a finding that Plaintiff could perform a range of medium work.

Similarly, I reject the Commissioner's argument that the ALJ was not required to consider Plaintiff's wrist weakness and CTS because it failed to meet the Social Security Act's one-year durational requirement.  Doc. 16 at 8-9.  In order to be severe, an impairment must have lasted or be expected to last for a continuous period of at least twelve months.  See 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1509, 416.909.  Here, Dr. Bunt mentioned Plaintiff's CTS for the first time in January 2012, and Dr. Choi performed a nerve conduction test on Plaintiff's arms in February 2012 - - that is, within three months of  ALJ  Lisewski's April 6, 2012 decision.  Tr. at 399, 413-14.  The Commissioner argues that because CTS is a treatable condition that often resolves with carpal tunnel release surgery, the condition would not meet the durational requirement.  However, Dr. Choi's identification of diabetic neuropathy as the likely cause of Plaintiff's wrist problem is significant because it suggests the condition is linked

to Plaintiff's diabetes, which is obviously expected to last for a continuous period of at least twelve months.  The record does not make clear whether, if Plaintiff's CTS is indeed the result of diabetes, surgery would eliminate his wrist impairment, and the ALJ's conclusion that it would is speculative in light of Dr. Choi's opinion.

Once an impairment satisfies the durational requirement, the ALJ is required to consider the impact of the impairment when assessing a claimant's RFC, whether the impairment is severe or non-severe.  See 20 C.F.R. §§ 404.1523, 416.923 ("[W]e will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.")  Therefore, even if Plaintiff's wrist problem is determined to be non-severe, it must be considered in formulating Plaintiff's RFC.

For the aforementioned reasons, I conclude that the ALJ's failure to consider Petitioner's wrist weakness and CTS, and therefore the possibility that he has manipulative limitations, renders the opinion not supported by substantial evidence. Therefore, I recommend this matter be remanded for consideration of whether and to what extent Plaintiff has manipulative limitations.

### B. Consideration of Plaintiff's Intellectual Disability

Plaintiff next argues the ALJ's opinion is not supported by substantial evidence because the ALJ failed to consider Plaintiff's intellectual disability and failed to order IQ testing.  Doc. 15 at 4-8; Doc. 17 at 1-4.  Defendant responds that this aspect of the ALJ's opinion is supported by substantial evidence.  Doc. 16 at 5-9.

The Commissioner argues that Plaintiff repeatedly alleged that he was disabled as a result of physical impairments, not as a result of a mental impairment or intellectual disability.  See Doc. 16 at 11 n.7.  However, Plaintiff's history of special education classes and limited reading and writing were the subject of testimony at both administrative hearings, Plaintiff's school records and IQ test results were included in the record, and the ALJ addressed the question of Plaintiff's alleged functional illiteracy in her decision.  Under the circumstances, it cannot be said that the ALJ was unaware of these purported limitations, and in any event the ALJ has a duty to develop a full and fair record, including securing relevant and updated information pertinent to a disability determination.  See Ventura v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995).

With regard to Plaintiff's alleged illiteracy, I note the regulations define illiteracy as "the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists. . . .   Generally, an illiterate person had little or no formal schooling."  20 C.F.R. §§ 404.1564(b)(1), 416.964(b)(1).  Here, Plaintiff's alleged functional illiteracy is questionable for the reasons identified by the ALJ, notably Plaintiff's successful completion of schooling through the twelfth grade with some "B's" and "C's" in reading and English, albeit in special education classes; the fact that he has a driver's license and therefore presumably passed a driver's license test; and Plaintiff's own statements that his activities include reading.  As reviewed in the above-quoted portion of the ALJ's opinion, the ALJ concluded that Plaintiff was not illiterate.  Tr. at 19.

Nevertheless, there is evidence that Plaintiff is limited in his ability to read and write, and it is unclear whether this limited ability is related to his intellectual deficits, particularly because the IQ tests evidenced in Plaintiff's school records were administered when he was a child and are therefore no longer valid.  See 20 C.F.R., pt. 404, subpt. P, app. 1, § 112.00(D)(10) ("IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above," and "IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above."); see also Harrold v. Astrue, 323 Fed. App'x 114, 116 (3d Cir. 2009) (six-year old child's performance IQ score of 69 was too remote to consider where plaintiff was old enough to trigger application of adult listings).  Courts have remanded for IQ testing where, as here, the record contains evidence of mental limitations and special education classes, but is otherwise incomplete.  See, e.g., Bunch v. Astrue, No. 08-0487, 2008 WL 5055741, *3 (E.D. Pa. Nov. 26, 2008) (Baylson, J.) (remanding to obtain consultative examination with IQ testing where claimant's medical history was incomplete as it related to his mental abilities); Byrd v. Astrue, No. 11-0051, 2012 WL 1378326, *2 (W.D. Va. Apr. 19, 2012) (evidence including claimant's placement in special education classes "sufficient to trigger the ALJ's duty to develop the record by ordering a mental status examination, including an I.Q. test").  Therefore, upon remand the ALJ should obtain expert testimony regarding the extent of Plaintiff's intellectual deficit and literacy, including updated

testing if deemed necessary, to determine whether and to what extent limitations in this regard impact Plaintiff's RFC.

### C.        Plaintiff's RFC

In a related argument, Plaintiff next contends that the ALJ's opinion is not supported by substantial evidence because the ALJ erroneously assessed Plaintiff as being capable of performing medium-exertional work. Doc. 15 at 12-13.[20]  RFC is defined as "the most [an individual] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  More specifically, an RFC assessment determines "what an individual can do in a work setting in spite of the functional limitations and environmental restrictions imposed by all of his or her medically determinable impairment(s)."  SSR 83-10, 1983 WL 31251, at *7.  If the case is at the administrative hearing level, the ALJ is responsible for assessing the claimant's RFC.

I have previously recommended remand of this matter for further consideration of whether and to what extent Plaintiff has manipulative limitations, and for clarification regarding the extent of Plaintiff's intellectual deficit and literacy.  Because remand for these reasons may change the ALJ's determination of Plaintiff's RFC, I do not find it necessary to address this claim at this time.

---

[20]In support of this argument, Plaintiff initially represented that the ALJ failed to discuss a CT scan taken on October 20, 2009, that showed the presence of bilateral L5 spondylosis.  Doc. 15 at 7, 12.  The Commissioner responded that the ALJ did in fact consider that CT scan, see Doc. 16 at 10-11, and in his reply brief Plaintiff's counsel acknowledged that he had erred.  Doc. 17 at 3-4.

**V.**     <u>**CONCLUSION**</u>

The ALJ found that while Plaintiff had severe impairments of diabetes mellitus, diabetic neuropathy, COPD, coronary artery disease, hypertension, and hypothyroidism, he retained the ability to perform a limited range of medium work including his past relevant work.  The ALJ's opinion is not supported by substantial evidence because the ALJ failed to consider whether and to what extent Plaintiff had manipulative limitations, and because it is unclear whether Plaintiff's limited literacy is related to his intellectual deficits, particularly because the IQ tests evidenced in Plaintiff's school records were administered when he was a child and are therefore no longer valid.  Therefore, upon remand, the ALJ should reconsider whether and to what extent Plaintiff has manipulative limitations, and obtain expert testimony regarding the extent of Plaintiff's intellectual deficit and literacy, including updated testing if deemed necessary.

Accordingly, I make the following:

## **R E C O M M E N D A T I O N**

AND NOW, this  15th  day of June 2016, it is RESPECTFULLY

RECOMMENDED that the case be remanded to the Commissioner pursuant to sentence

four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report, Judgment

be entered REVERSING the decision of the Commissioner of Social Security for the

purposes of the remand only, and the relief sought by Plaintiff be GRANTED to the

extent that the matter be REMANDED for further proceedings consistent with this

adjudication.  The Parties may file objections to this Report and Recommendation.  <u>See</u>

Local Civ. Rule 72.1.  Failure to file timely objections may constitute a waiver of any

appellate rights.

BY THE COURT:

/s/ELIZABETH T. HEY

_____

ELIZABETH T. HEY, M.J.